```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                    SOUTHEASTERN DIVISION
```

BRENDA HENDRIX,                      )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )    No. 1:08 CV 115 DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Brenda Hendrix for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(c). For the reasons set forth below, the court reverses and remands the decision of the Administrative Law Judge (ALJ).

## **I. BACKGROUND**

On October 12, 2005, plaintiff filed an application for disability insurance benefits. (Tr. 10, 62.) She alleged an onset date of March 1, 2004, and alleged disability based on depression, memory loss, suicidal ideation, and impairments of her spine and knees. (Tr. 101, 106.) Her claim was denied and she requested a hearing, appealing directly to the ALJ.[1] (Tr. 62-67.)

On May 22, 2007, following a hearing, an Administrative Law Judge (ALJ) found plaintiff was not disabled within the meaning of the Act. (Tr. 10-22.) On June 10, 2008, the Appeals Council denied her request

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966 (2007). These modifications include, among other things, the elimination of the reconsideration step. See id.

for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.[2]

## II. MEDICAL HISTORY

Plaintiff was born in 1958. (Tr. 101, 106). She worked as a certified nurse's assistant (CNA) from 1994 until July 2004 when she stopped working as a CNA due to back and knee pain. (Tr. 93-94, 106-07). In support of her claim, plaintiff provided records from Dr. Mazher Hussain, M.D., her psychiatrist; Dr. Cheryl Rich, M.D., her primary care physician; and Dr. Deborah Rau, a psychologist.

Plaintiff reported, with the assistance of her cousin's recollection, that she was hospitalized for three months at Lucy Lee Hospital in Poplar Bluff for a nervous breakdown at age 16. (Tr. 13, 224.)

In March 2005, plaintiff sought treatment for left knee pain on two occasions. X-rays of her knees were normal on both occasions. (Tr. 15, 185, 207.) X-rays of her hips were also normal. (Tr. 173.) At a follow up examination plaintiff was advised to walk and move as much as possible. (Tr. 177.)

In August 2005, during a consultative examination for a Medicaid application, x-rays of her spine and ankles were normal. (Tr. 213.) She was 5 feet 3½ inches tall and weighed 304 pounds. Plaintiff was able to walk without any significant limp, and although she was very "jumpy," Michael Clarke, M.D., an orthopaedist, found no signs of knee instability or effusion. (Tr. 213.) Dr. Clarke also noted that plaintiff was not taking any significant medications for her physical impairments. (Tr. 16, 213.) Dr. Clarke opined that plaintiff's "objective orthopedic findings [were] not commensurate with her subjective complaints." (Tr. 16, 214.)

From December 12-23, 2005, plaintiff was hospitalized at Poplar Bluff Regional Medical Center (Poplar Bluff) for depression and suicidal

---

[2]On October 11, 2008, with respect to a separate application for benefits, the Administration determined that plaintiff was permanently disabled as of May 23, 2007 and entitled to benefits. (Doc. 13. Ex. A.)

-2-

ideation following an argument with her husband and mother-in-law. (Tr. 238-51.) The record shows plaintiff's husband of 26 years was leaving her. (Tr. 239.) Plaintiff complained that her mother-in-law had threatened to throw her out of the house unless she found employment and that she had nowhere to go. Upon her release, she began a trial basis of a mood stabilizer and Prozac, an anti-depressant.

From February 1-6, 2006, plaintiff was again hospitalized at Poplar Bluff for suicidal thoughts and stress after being seen in the emergency room there. (Tr. 228-38.) She also described hearing voices telling her to take all of her prescription medications. (Tr. 232, 234.) She appeared seriously cognitively limited during an interview. (Tr. 235.)

On February 26, 2006, plaintiff was admitted to the mental health unit at Poplar Bluff via the emergency room for depression and suicidal ideation. She was going through a divorce at the time. (Tr. 222-37.) Plaintiff resisted admission to the hospital and was accompanied by the police and her cousin, and was reportedly "losing it." Her cousin was reportedly seeking guardianship of her at the time. (Tr. 224.) Upon discharge, her Prozac was increased and she was encouraged to attend group and individual therapy. Her behavior would be monitored for dangerousness and psychosis. Physical examinations performed during her psychiatric hospitalizations in early 2006 showed that she had a normal gait. (Tr. 16, 222, 225, 231.)

On January 25, 2006, plaintiff was first seen at the Family Counseling Center, Inc. in Poplar Bluff where she was seen by psychiatrist Mazher Hussain, M.D. In correspondence dated August 1, 2006, Dr. Hussain stated that plaintiff had been diagnosed with depressed type schizoaffective disorder[3] and general anxiety disorder, and that her current medications included Abilify;[4] the antidepressants Prozac, Wellbutrin XL, and Trazadone; and Klonopin, for panic disorder.

---

[3]Schizo-affective disorder is defined as having an admixture of symptoms suggestive of both schizophrenia and affective disorder. Stedman's Medical Dictionary 1728-29 (28th ed. 2006).

[4]Abilify is used in the treatment of schizophrenia, and is thought to work by modifying the sensitivity to two of the brain's chief chemical messengers, serotonin and dopamine. DR Drug Guide for Mental Health Professionals 1 (2nd ed. 2004).

-3-

Dr. Hussain opined that she would not be able to return to work for at least one year. (Tr. 329.)  Dr. Hussain's psychiatric evaluation dated February 1, 2006 assigned plaintiff a global assessment and functioning (GAF) score of 30[5] and a diagnosis of recurrent severe major depressive disorder with psychotic features. (Tr. 130-32.)

In November 6, 2006 correspondence to plaintiff's attorney, Dr. Rich, plaintiff's primary care physician, opined that plaintiff's psychiatric and mental health conditions had resulted in her "inability to achieve gainful employment" and "total and permanent disability.  I do not believe she will ever be able to be an active participant in the work force . . . ."   (Tr. 15, 327.)  On March 22, 2007, Dr. Rich completed a Mental Residual Functional Capacity Assessment Form in which she noted, among other things, that plaintiff was not able to drive, manage her finances, cook, prepare meals, or grocery shop.  She opined that plaintiff had numerous "extreme" limitations and "poor to [no]" ability to adjust to a job.  (Tr. 330-35.)

On July 24, 2007 plaintiff's attorney referred her to clinical psychologist Deborah Rau, Ph.D., for a psychological evaluation.  Dr. Rau opined that plaintiff was disabled and unable to perform any substantial gainful activity. (Tr. 28.)  She assigned plaintiff a GAF score of 40, and diagnosed post-traumatic stress disorder, major depression, (recurrent and severe), and mild mental retardation (based on school records which indicated she was placed in special education classes for all of her schooling) and limited cognitive functioning. (Tr. 25–28.)  Dr. Rau opined that plaintiff would have been disabled from birth.  (Tr. 28.)

From January 15-28, 2008, (after the decisions of the both the ALJ and the Appeals Council), plaintiff was hospitalized at Twin Rivers

---

[5]A GAF of 31-40 is indicative of having some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  Diagnostic and Statistical Manual of Mental Disorders (4th ed., Text Revision 2000) (DSM-IV-TR), 34.

Regional Medical Center for depression and suicidal ideation. (Doc. 13, Ex. B.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on April 3, 2007. (Tr. 33-58.) Plaintiff testified that she has a GED and has worked in the past as a CNA. (Tr. 38.)

Plaintiff testified that she married her current husband, Eddie Hendrix, a longtime friend, on June 13th, but that she could not remember of what year. (Tr. 35.) Her attorney clarified that she was married the previous summer, on June 13, 2006, and was married at a ceremony before about ten people. (Tr. 35, 54.) Plaintiff testified that she and her husband live in a "trailer house," but that she could not remember her current street address. (Tr. 35-6.) She testified that she lives with her husband, who is disabled, but who cares for himself. (Tr. 36-7.) Plaintiff testified that she could not remember when she stopped working and that she did not think she ever filed for unemployment. (Tr. 38.) Plaintiff testified that Dr. Rich diagnosed her with arthritis in her knee and back, but that she did not remember when, and that she had had her knee impairment for "a while." (Tr. 39-41.) She testified that she fell off her sister's porch several times, but could not remember when. (Tr. 40.)

Plaintiff testified that she sees Dr. Hussein every month; that he diagnosed her with depression and "schizophrenic"; and that she cannot remember things. (Tr. 41-42.) She testified that she has been taking her current medication for about two years, and that her medication has been modified, but that she could not remember when. (Tr. 43-44.)

Plaintiff testified that she has attempted to commit suicide and that she hears voices. (Tr. 48.) She testified that she went to the "stress ward" at Poplar Bluff for the first time, she believed, in 2004, after trying to commit suicide. (Tr. 45.) She testified that her cousin called the police who took her to the Stress Unit after she tried to run away and considered killing herself by running out in front of a car. (Tr. 50.)

Plaintiff testified that she did not know what a "schizoaffective disorder" was. (Tr. 46.) She testified that she gets "real nervous" around crowds of people and just does not want to be around them; that she is sometimes nervous around small groups of people; that "talking and, too many people crowding in" makes her nervous; and that children make her nervous. (Tr. 47.) She testified that she did not know what a manic-depressive was, but that she thought Dr. Hussein might have told her that sometimes her mood is real high and sometimes her mood is real low. (Tr. 47.) She testified that her current medications calm her down and "helps [her] through being nervous and stuff." (Tr. 48.) She testified that she sometimes forgets to take medications, at which time she starts getting nervous and real angry and wants to kill herself. (Id.) She also testified that she has seen a woman telling her to jump out of a pick up truck. (Tr. 49.)

Plaintiff testified that she typically goes to bed about 11:00 p.m., and that she gets up around 11:00 or 12:00 in the morning, watches some TV, and then spends about five or six hours "staring at the walls." (Tr. 50-54.) She testified that she also takes a nap in the afternoon. (Tr. 51.) She testified that she does not answer the phone in her house because she does not like talking to people; that she does not return phone calls because she forgets to; that her husband calendars important dates for her, such as appointments; and that her cousin receives her mail for her at her cousin's home. (Tr. 51-52.) She testified that her husband does the laundry and most of the cleaning; that she and her husband usually eat TV dinners; that her husband heats up the TV dinners because she burns them; and that the last time she attempted to cook using a recipe she forgot to add an ingredient. (Tr. 52-53.)

Plaintiff testified that she has difficulty getting dressed, particularly putting on underwear and socks, and that she simply doesn't feel like wearing them anymore. (Tr. 53.) She testified that she does not read the newspaper, use the internet, or socialize, and that she "sometimes" attends church. (Tr. 54.) She testified that she was married in a church before about ten family members, that she and her husband left the church immediately after the ceremony; and that they did not go on a honeymoon. (Tr. 54, 57.)

She testified that the extent of her socializing consisted of visiting with her future husband in her cousin's house. (Tr. 55.) She testified that at the time she met her current husband she was spending a lot of time staring at the walls. (Id.) She testified that she does not have any pets, and that she can walk about a quarter of a city block before needing to stop. (Tr. 55-56.) She testified that she does not have to carry groceries because her husband carries them for her; that she has not been on a vacation in several years; and that she used to crochet and embroider, but stopped about five years ago. (Tr. 57.)

### III. DECISION OF THE ALJ

On May 22, 2007, the ALJ issued an unfavorable decision. (Tr. 10-22.) The ALJ found that plaintiff had "severe" impairments, including depression, schizoaffective disorder, generalized affective disorder, and obesity. (Tr. 16.) She further found that none of the impairments, singly or in combination, were severe enough to meet or medically equal an impairment in the Listing of Impairments at 20 C.F.R. Part 404, Subpt. P, App. 1 (Tr. 18.)

The ALJ performed a credibility determination and found that plaintiff's subjective complaints were not fully credible. (Tr. 13-19.) The ALJ found that plaintiff retained the residual functional capacity (RFC) to lift up to 20 pounds occasionally and 10 pounds frequently, sit for six hours in an eight-hour day with normal breaks, and stand and walk for six to eight hours in an eight-hour day. (Tr. 19.) The ALJ also limited plaintiff to unskilled work. (Tr. 19.) The ALJ found that plaintiff's RFC did not allow her to perform her past relevant work (PRW) as a CNA. However, the ALJ found she was capable of performing other work existing in significant numbers in the national economy. (Tr. 19-20.) Consequently, the ALJ found that plaintiff was not disabled under the Act.

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work. (Id.) The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the

burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work.  Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) performing her credibility analysis; (2) determining plaintiff could perform other work existing in significant numbers in the national economy; and (3) failing to call a vocational expert to testify.  She also argues new evidence warrants remand.

### A. The ALJ's Credibility Analysis.

Plaintiff argues the ALJ's credibility assessment is not supported by substantial evidence.  Specifically, she argues the ALJ used her own beliefs and speculation to imagine how an individual with plaintiff's mental condition should act.  She also argues the ALJ attempts to color her opinion by giving the impression that the physicians were not in good positions to offer their opinions.  This court agrees.

In assessing the credibility of a claimant, the ALJ is required to examine and to apply the factors from Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) or from 20 C.F.R. § 404.1529.  The factors include: (1) the claimant's prior work history; (2) the claimant's daily activities; (3) the duration, frequency, and intensity of the claimant's pain; (4) precipitating and aggravating factors; (5) dosage, effectiveness, and side effects of medication; and (6) functional restrictions.  Id.; O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003).  While these factors must be taken into account, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination.  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007).  The Polaski factors also apply in evaluating subjective complaints of mental problems.  Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

The ALJ may discount subjective complaints of pain when the complaints are inconsistent with the evidence as a whole.  Id. However, the ALJ may not discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims.  O'Donnell, 318 F.3d at 816.  When rejecting a

claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696.

In this case, plaintiff alleged disability due to depression, memory loss, suicidal thoughts, and impairments of the spine and knees. (Tr. 106.) The ALJ found plaintiff's allegations were not credible. The ALJ noted, among other things, that plaintiff had not established a long-term pattern of mental impairment or treatment, which the ALJ believed undermined her allegation that her mental impairments had been significant as far back as her alleged onset date. (Tr. 13.)

The ALJ also found that gaps in treatment between plaintiff's March 1, 2004 and December 12, 2005 hospitalizations undermined the significance of her mental impairment; she believed that because there was a lengthy gap in treatment, plaintiff had not had a long degree of mental degeneration. (Tr. 13.)

The ALJ also found plaintiff's GAF score was based on a paucity of significant symptoms. She noted that plaintiff's GAF score, "much like the others in the file" was not based on long term treatment. Therefore, she accorded it and others like it in the record limited value.

This court concludes that the ALJ's determination that plaintiff's lack of long-term psychiatric care negatively affects her credibility was in error. The Eighth Circuit holds that a claimant's failure to seek treatment for a mental impairment or to allege disability based on a mental impairment was not a basis for finding that she did not suffer from a mental impairment. Jones v. Chater, 65 F.3d 102 (8th Cir. 1995). "[F]ederal courts have recognized a mentally ill person's noncompliance . . . can be, and usually is, "the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) (citations omitted).

Social Security Ruling 82-59 lists the circumstances under which "an individual's failure to follow prescribed treatment will be generally accepted as 'justifiable' and, therefore, such 'failure' would not preclude a finding of 'disability' ...." SSR 82-59. Although none of the listed circumstances pertain to mental illness, federal courts have recognized a mentally ill person's noncompliance can be, and usually is, the "result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996) (citing Sharp v. Bowen, 705 F. Supp. 1111, 1124 (W.D. Pa. 1989)); see also Frankhauser v. Barnhart, 403 F. Supp.2d 261, 277-78 (W.D.N.Y. 2005) (holding an ALJ must take into account whether a mentally ill (bipolar and personality disordered) claimant's failure to comply with prescribed treatment results from the mental illness itself); Brashears v. Apfel, 73 F. Supp.2d 648 650-52 (W.D. La. 1999) (remanding case for consideration of whether the claimant's noncompliance with prescribed treatment was excusable due to a mental impairment).

Here, there is substantial record evidence in the form of objective medical evidence to support plaintiff's mental conditions. Plaintiff has been hospitalized on several occasions for her mental conditions, sometimes for extended periods. Drs. Rich, Hussain, and Rau all concur in their opinions that plaintiff is unable to work.

Here, when the ALJ made her credibility determination based on gaps in treatment or lack of continuity of care, she should have considered plaintiff's mental conditions, her limited cognitive functioning, and her domestic situation, i.e., that plaintiff's husband of twenty six years was seeking a separation and her emergency lack of housing, both of which appeared to precipitate her breakdown. The record appears to demonstrate that plaintiff resisted medical care and treatment because of her mental condition and cognitive limitations, and only sought treatment when she was in an emergency situation and was forced to do so with the assistance of her cousin. The ALJ should have explored, or at least considered, these factors before discrediting her subjective complaints, but did not do so. Cf. Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991) (remanding for other reasons but commenting that

the ALJ should consider the claimant's subjective ability to comply with prescribed treatment regimens in part because claimant was an individual of borderline intelligence with mild to moderate memory impairment). This court concludes the ALJ's failure to acknowledge and apply the factors and standards set forth in Polaski, before discounting plaintiff's subjective complaints, amounted to error.

The ALJ found that plaintiff was able to perform a wide range of daily activities, such as washing clothes, preparing meals, cleaning and grooming herself, and sitting on the porch. (Tr. 17.) The ALJ concluded that these daily activities were not limited to the extent "one would expect," given plaintiff's complaints of disabling symptoms and limitations. As discussed more fully below, the ALJ's use of the phrase "one would expect" implies a medical opinion that the ALJ is incompetent to render.

The ALJ's finding regarding plaintiff's daily activities is also inconsistent with the evidence of record. During the administrative hearing, plaintiff testified that she sleeps twelve hours a day, watches some TV, naps, and spends five or six hours "staring at the walls." She testified that she does not socialize, cook, read the newspaper, answer the phone, or return phone calls. She testified that she has no hobbies, that her disabled husband does the laundry, most of the cleaning, and prepares TV dinners for them. She testified that she has difficulty getting dressed, specifically putting on her underwear and socks, and that she simply doesn't feel like wearing them anymore. This court concludes substantial evidence does not support the ALJ's finding. Cf. Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) ("daily activities [such] as getting up, eating, reading, cleaning the house, making the bed and doing dishes with the help of [a spouse], making meals, visiting with friends, and occasionally shopping and running errands" can be relevant to the credibility of a claimant's subjective complaints of disabling pain).

The ALJ also noted that when plaintiff visited the Family Counseling Center on January 25, 2006, an examination showed that she was neat, well groomed, cooperative, and had appropriate affect; that she was able to indicate the current date, month, and year; that her

concentration and attention were attentive; and that her vocabulary, abstract thinking, and memory were normal. The ALJ found these facts undermined plaintiff's allegations of impaired memory. (Tr. 13.) With respect to plaintiff's February 2006 hospitalization, the ALJ found the fact that plaintiff complained of hearing voices and of poor memory, but was able to read and write without any problems, and was apparently vague in her answers to other questions was not supportive of her claim of mental impairment. (Tr. 14.)

The ALJ also concluded that plaintiff's hospitalizations were not consistent with what one would expect if plaintiff were "truly disabled because of her mental impairments." (Tr. 15.) The ALJ again referenced plaintiff's gaps in treatment, as well as her vague answers to questions about her mental impairment, as reasons to discredit her allegations and the opinions of her treating physicians. (Tr. 15.)

The court concludes the ALJ improperly substituted her judgment for that of plaintiff's physicians. This is error. Eighth Circuit law is clear that the ALJ must not substitute his opinion for that of the physician. See Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (by substituting his observation that [the claimant] did not appear to be depressed or unhealthy during the hearing for the medical judgment of her doctor that the claimant was still suffering from depression, the ALJ ignored the law of this circuit, which states that the ALJ must not substitute his opinion for that of the physician).

The ALJ also found that plaintiff's physicians were not in a good position to opine as they did. The ALJ discredited Drs. Hussain and Rich's opinions, finding that their use of the word "disabled" was a legal term reserved for the Social Security Administration and beyond their area of expertise. The ALJ also found that neither of those physicians had a long term history of treating plaintiff, that plaintiff's visits to those physicians had been infrequent and brief, and that plaintiff's compliance had been questionable. The ALJ also speculated that Dr. Rich, plaintiff's primary care physician, had made assessments beyond her area of expertise. (Tr. 15.)

While Dr. Rich used the term "disabled", she also used other language to describe plaintiff's inability to work. Dr. Hussain did not

used the term "disabled."  The opinions of Drs. Rich and Hussain are based on their observations and treatment of plaintiff, both of whom are qualified to treat plaintiff.  The language of their opinions that did not use the term "disabled" are uncontradicted by any other medical evidence in the record.  Therefore, this court concludes their opinions and reports constitute substantial evidence which detracts from the decision of the ALJ.

Plaintiff also alleged significant social limitations.  The ALJ found that plaintiff's participation in her wedding ceremony before about ten family members was inconsistent with her allegations of significant social limitations.  (Tr. 17.)  This court disagrees.  Participation in one's own wedding, with eleven other people, including the groom, an event which occurs infrequently in a lifetime, cannot reasonably be equated with a recurring and substantial social occasion that indicates that one does not have a general aversion of socializing in groups.

Substantial record evidence supports plaintiff's allegation of social limitations.  The court notes, among other things, that Dr. Hussain diagnosed plaintiff with depressed type schizoaffective disorder and general anxiety disorder.  His psychiatric evaluation dated February 1, 2006 assigned a GAF score of 30 and diagnosed recurrent severe major depressive disorder with psychotic features.  (Tr. 130-32.)  Plaintiff herself testified that she does not answer the phone or return phone calls because she does not like talking to people (Tr. 51-52); that she does not read the newspaper, use the internet, or socialize (Tr. 54); that she and her husband left the church immediately after their wedding ceremony; and that they did not go on a honeymoon.  (Tr. 54, 57.)  Based on the above, the ALJ's finding is not a good reason for discrediting her allegation of social limitations.

In sum, the ALJ did not give sufficiently "good reasons" for discounting plaintiff's subjective complaints of limitations.  The court therefore concludes the reasons given by the ALJ for discrediting plaintiff's complaints are insufficient, and her finding that plaintiff's complaints are not entirely credible is not supported by substantial evidence.  Accordingly, this court concludes this matter is

reversed and remanded to the Commissioner in order for the ALJ to more fully evaluate plaintiff's complaints under the standards set out in Polaski.


**B.   Other Work in the National Economy**

Plaintiff argues that the ALJ did not give examples of the types of work she could perform and did not obtain vocational expert testimony.  In light of the court's conclusion that the ALJ erred in her credibility determination and decision to remand this matter, the court need not address this issue at this time.


**C.   New Evidence**

Plaintiff also seeks remand under Sentence 6 for the purpose of submitting additional medical evidence not previously considered with respect to her claim for benefits.  In support, counsel submitted the medical records from plaintiff's hospitalization at Twin Rivers Hospital from January 15-21, 2008.  She asserts that she was again hospitalized for a serious mental condition and her diagnosis at Twin Oaks was the same as the diagnoses of Drs. Hussain, Rau, and Rich.  The Commissioner argues the new evidence is not material and pertains to plaintiff's status nearly one year after the ALJ's determination.  The court agrees.

A sentence six remand is authorized in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint of a claimant seeking reversal of an administrative ruling, or (2) where new and material evidence is adduced that was for good cause not presented during the administrative proceedings.  See 42 U.S.C. § 405(g); Shalala v. Schaefer, 509 U.S. 292, 297 n.2 (1993); Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993).

New evidence does not include cumulative evidence which would not have changed the ALJ's decision.  Riley v. Shalala, 18 F.3d 619, 623 (8th Cir. 1994).  Good cause for the failure to present the evidence previously may be shown by the fact that the subject evidence did not exist previously.  Goad v. Shalala, 7 F.3d 1397, 1398 (8th Cir. 1993). Materiality, which is treated as a separate test under § 405(g), relates

to the claimant's condition on or before the date of the ALJ's decision. <u>Id.</u> To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's decision. <u>Id.</u>

Following a review of the evidence, the court concludes that the new evidence is material under § 405(g) because, although it records plaintiff's condition in January 2008, it may be probative of plaintiff's condition during the relevant time period, merely eight months earlier.

### III. CONCLUSION

The court concludes a reasonable mind would not conclude that the evidence in this record is adequate to support the decision that plaintiff is able to do other work in the national economy. This matter is remanded to the Commissioner to (1) properly evaluate the opinions of plaintiff's medical providers; (2) reassess plaintiff's testimony and credibility in light of her mental impairments; (3) further develop the record with additional consultative examinations and testing; and (4) consider the post-hearing medical records submitted by the plaintiff.

An appropriate judgment order is filed with this memorandum.

　　　　　　　　　　　　　　　　　　／S／　　David D. Noce　　　
　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on September 8, 2009.